UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KENNEDY LINTERN,

        Plaintiff,        Civil Action No.: 14-12034
                              Honorable Paul D. Borman
        v.                   Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [R. 14, 16]**

      Plaintiff Kennedy Lintern appeals a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for child supplemental security income benefits ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions, referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court finds that the administrative law judge ("ALJ") did not err in assessing less than marked limitations in the six functional domains and concluding that Lintern was not disabled. For these reasons, the Court **RECOMMENDS** that:

- the Commissioner's motion **[R. 16]** be **GRANTED**;

- Lintern's motion **[R. 14]** be **DENIED**; and,

- the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

I.   **BACKGROUND**

   A.   **Lintern's Background and Claimed Disabilities**

Lintern was seven years old on July 1, 2011, the date her mother applied for benefits, alleging disability as of January 1, 2006. [R. 10-5, Tr. 107-76]. Lintern claims she is disabled as a result of a congenital heart defect, juvenile arthritis, emotional problems and "possible ADHD" (Attention-Deficit Hyperactivity Disorder). [R. 10-6, Tr. 184].

   B.   **Procedural Background**

Lintern's claim was denied initially on October 10, 2011, and she filed a timely request for an administrative hearing. [R. 10-4, Tr. 149-55]. The ALJ initiated the hearing on September 26, 2012, but continued it to permit Lintern's mother to secure representation. [R. 10-2, Tr. 89-103]. At the continued hearing on October 30, 2012, counsel appeared and Lintern and her mother testified. [*Id.*, Tr. 104-39]. In a January 25, 2013 written decision, the ALJ noted that Lintern had filed a prior claim, adjudicated at the ALJ level on March 6, 2006, with a finding of not disabled. [*Id.*, Tr. 17]. She concluded, however, that new evidence precluded application of

Acquiescence Ruling 98-4.  [*Id.*].  She nevertheless determined that, despite the new evidence, Lintern remained not disabled.  [*Id.*, Tr. 14-37].  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  [*Id.*, Tr. 1-6].  Lintern timely filed for judicial review.  [R. 1].

### C. The ALJ's Application of the Disability Framework Analysis

SSI is available for children who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner determines whether an child is disabled by analyzing three sequential steps, assessing: (1) whether the child is engaged in "substantial gainful activity"; (2) whether the child has a "severe" impairment;[1] and (3) whether the child's impairment meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  *See* 20 C.F.R. §416.924(a).

---

[1] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 1520(c); 920(c).

Functional equivalence is demonstrated by the existence of an "extreme" limitation in one of six domains, or a "marked" limitation in two of the six. 20 C.F.R. § 4156.926a(d). An extreme limitation is one that interferes "very seriously" with a claimant's ability to independently initiate, sustain and/or complete activities. 20 C.F.R. § 416.926a)(e)(3)(i). A "marked" limitation exists where the impairment interferes "seriously" with these abilities. 20 C.F.R. § 416.926a(e)(2)(i). If the impairment or combination of impairments does not meet or medically or functionally equal a listing, the child is not disabled. 20 C.F.R. §416.924(a).

Applying this framework, the ALJ concluded that Lintern was not disabled. At the first step, she found Lintern had not engaged in substantial gainful activity since her application date. [R. 10-2, Tr. 20]. At the second step, she found the following severe impairments: "small to moderate size muscular apical ventricular septal defect; juvenile idiopathic arthritis and/or psoriatic arthritis; leg length discrepancy; affective mood disorder and/or oppositional defiant disorder." [Id.]. Next, the ALJ addressed Lintern's limitations, and concluded that none of her impairments, either alone or in combination, met or medically equaled a listed impairment. [*Id.*, Tr. 20-21]. She went on to conclude that none of Lintern's impairments functionally equaled a listed impairment, finding less that marked limitations in each of

the six functional domains. [*Id.*, Tr. 21-33]. As a result, she determined Lintern was not disabled. [*Id.*, Tr. 33].

## II. ANALYSIS

### A. Standard of Review

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence. *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

Lintern argues that the ALJ erred in finding less than marked limitations in three of the six functional domains: (1) Interacting and Relating with Others; (2) Caring for Yourself; and (3) Health and Physical Well-Being. Upon reviewing the decision and the evidence of record, the Court finds that the ALJ's conclusions are supported by substantial evidence of record. Indeed, the record supports a finding that, while Lintern has been burdened at a young age with a number of challenges, she is highly intelligent and puts forth good effort to get better. Consequently, she has shown improvements both physically and emotionally. From the record, she appears to be capable, not disabled.

### B.     Interacting and Relating with Others

Lintern first argues that the ALJ, in finding less than a marked limitation in the domain of interacting and relating with others, failed to identify "a single medical or educational record to support" her position. While the ALJ did not cite to specific evidence in assessing this domain, she discussed the relevant evidence used to support her finding in detail earlier in her decision, and was not required to re-cite the evidence again. [R. 10-2, Tr. 21-33]; see *Vandenboss v. Comm'r of Soc. Sec.*, No. 14-12283, 2015 U.S. Dist. LEXIS 79745, *11-12; 2015 WL 3823558, *5-6 (E.D. Mich. May 16, 2015) (citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir.

2004)). For school-aged children (ages six to twelve), the functional domain of interacting and relating with others includes the ability to develop lasting friendships, understand how to work in groups to solve problems, tolerate differences and see others' points of view, and talk to familiar and unfamiliar people of all ages in an understandable manner. 20 C.F.R. § 416.926a(I)(iv). The ALJ considered all of the record evidence and determined that Lintern's behavior, when compliant with medication, did not rise to the level of a marked limitation in interacting with others. [R. 10-2, Tr. 25-26, 29-30], and this finding is supported by the evidence of record.

It is true that records from 2011 document that Lintern had behavioral problems both at home and at school, including physically fighting with siblings, lashing out at peers and teachers, refusing to complete assignments, disrupting class to the level of suspension and expulsion, expressing suicidal ideations, threatening self-harm, and she was issued Global Assessment of Functioning ("GAF") scores of 40 and 50.[2] [R. 10-7,

---

[2] The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning." *Norris v. Comm'r of Soc. Sec.*, No. 11-5424, 461 Fed. Appx. 433, 436 n.1 (6th Cir. 2012) (citations omitted). Scores in the range of 61-70 indicate some mild symptoms. *Karger v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 739, 745 (6th Cir. 2011).

Tr. 293-95, 340-41, 386, 390, 400-401, 443-70; R. 10-8, Tr. 550-71, 578-91]. However, in early December 2011, Lintern treated with psychiatrist Mohammad Jafferany, M.D, who prescribed Abilify and citalopram for mood disorder. [R. 10-7, Tr. 436, 485-87]. Within a week, Lintern's mother reported a difference in Lintern's behavior, and by January 2012 she reported that Lintern was relaxed, easily redirected, was no longer having aggressive outburst or anger issues, and her school noticed a "huge difference in her overall behavior." [R. 10-8, Tr. 503, 507; R. 10-7, Tr. 436, 488].

Also in January 2012, a special education record acknowledged that Lintern's condition had improved slightly since starting medication, and social worker Katheryn MacKinnon found that Lintern no longer threw tantrums, was more easily redirected and had fewer outbursts. [ R. 10-7, Tr. 436-42; R. 10-8, Tr. 571, 578]. Over the course of 2012, Lintern's behavioral issues continued to improve, with occasional set-backs. In February, Lintern's mother reported continued mood swings, aggression and defiance at home, but no major problems at school. [R. 10-7, Tr. 489]. Dr. Jafferany increased Lintern's Abilify dosage. [*Id.*]. In March and April, MacKinnon and Dr. Jafferany documented self-harm displays, outbursts and suicidal remarks at school, and Dr. Jafferany increased Lintern's

citalopram dosage. [*Id.*, Tr. 420-35, 490; R. 10-8, Tr. 540]. Within two weeks, therapist Ashley Luplow commented that she was seeing changes in Lintern's behavior; while Lintern continued to have temper tantrums in school, her conduct at home had improved. [R. 10-7, Tr. 473]. In June, Lintern's mother reported that she was fine when on medication, although she sometimes deliberately missed doses. [*Id.*, Tr. 491-92].

MacKinnon noted around that time that Lintern was no longer engaging in self-harm, although she continued to have chronic absences, marked changes in mood, and severe "[b]ehaviors and activities beyond her caregiver's influence." [R. 10-8, Tr. 541-42]. By late July, Lintern had not threatened self-harm in three months, was learning coping skills, reducing her outbursts at school and physical aggression at home, and had had a positive summer camp experience. [R. 10-7, Tr. 474]. In early September, MacKinnon and Dr. Jafferany documented reports of disruptive behaviors, impulsivity and hyperactivity. [R. 10-7, Tr. 493; 10-8, Tr. 543]. However, Lintern's mother reported that there were no major concerns at school and Lintern was not engaging in self-harm or exhibiting more than moderate difficulties in behaving toward others. [*Id.*]. Dr. Jafferany added a third medication to Lintern's regimen. [R. 10-7, Tr. 493].

Lintern's mother testified at the hearing that she had received fewer

calls from the school regarding Lintern's behavior during the 2012 school year, and that Lintern's teachers and social workers had largely been able to contain her tantrums before they got out of control. [R. 10-2, Tr. 127]. Social work classroom observations and meeting notes between September and November 2012 corroborate this testimony; Lintern was observed as pleasant, bright and clever, with an increased ability to regulate and control emotions with less intervention. [R. 10-8, Tr. 547-49]. No classroom disruptions were observed. [*Id.*]. Although Lintern was frequently absent in November 2012, it was documented as the result of her mother's depression, not her own behavior. [*Id.*, Tr. 549]. Similarly, Lintern's mother faulted Lintern's siblings for their poor relationship; the older two siblings picked on Lintern "quite a bit." [R. 10-2, Tr. 128].

Lintern's math teacher, Jamie Zientak, reported that "Kennedy is very capable of being academically successful" and that the beginning of the year was a breeze, although Lintern struggled when new material was introduced, shut down when frustrated, and could be extremely aggressive and rambunctious with her peers. [R. 10-8, Tr. 601]. Ms. Zientak noted that "when provided with kind words of encouragement and an interest

beyond school and homework, Kennedy tends to thrive."[3]  [*Id.*].

Lintern points to selected records in support of her challenge to the ALJ's decision that she had less than a marked limitation in interacting and relating with others, many of which preceded the date she began taking and responding to medications for her conditions.  [R. 14, PgID 659-64].  The ALJ recognized those records, but found that the more recent records showed improvement with medication, which did "not support mental impairments of such severity as to seriously interfere with the claimant's daily functioning or to render her disabled."  [R. 10-2, Tr. 30].  That decision was properly within the ALJ's "zone of choice."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation and internal quotation marks omitted).

Of final note regarding this domain, Lintern argues that the ALJ should have given weight to the opinion of social worker MacKinnon, who opined in November 2012 that Lintern was markedly and moderately limited in a number of functions.  [R. 10-8, Tr. 545-46].  Nonetheless, as a social worker, Mackinnon is not an acceptable medical source pursuant to the regulations, and thus her opinion is not entitled to any special deference.  20 C.F.R. § 404.1513(a); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. Appx. 109, 119 (6th Cir. 2010).  Further, contrary to

---

[3] While this letter itself is undated, the social work notes from September through November 2012 list Zientak as one of Lintern's teachers.

11

Lintern's argument, the ALJ did consider MacKinnon's opinion and determined that it was inconsistent with the weight of the evidence showing that Lintern's behavioral issues improved with treatment. The Court agrees with this assessment.

For example, MacKinnon's opinion that Lintern was markedly limited (i.e., had no useful ability) "to accept instructions and respond appropriately to criticisms from teachers and supervising adults" was contradicted by Ms. Zientak's indication that Lintern responded to words of encouragement. [R. 10-8, Tr. 601]. Also telling was Lintern's receptiveness to, and implementation of, social worker Melina Calice's instructions for problems-solving, including the use of journaling. [*Id.*, Tr. 547-48]. Calice's October 22, 2012 entry is illustrative: "Kennedy was upset about something that happened in Art class. In social work, Kennedy expressed her frustration, problems-solved a solution and returned to the rest of the class. She shared that she continues to use her feelings notebook." [Id., Tr. 548]. Three days later, Zientak told Calice that "when Kennedy gets upset she writers [sic] her feelings in a notebook and is able to regulate and control her emotions." [*Id.*]. These more recent records support the ALJ's opinion that Lintern was not markedly limited in interacting and relating with others.

### C. Caring for Yourself

Lintern argues that the ALJ erred in finding a less than marked limitation in this functional domain because she failed to discuss Lintern's self-harming behaviors. Among the examples of limited functioning in this domain is the engaging in of self-injurious behavior, which includes suicidal thoughts, self-inflicted injury and refusal to take medication. 20 C.F.R. § 416.926a(k)(3)(iv). While it is true that the ALJ made no specific mention of Lintern's incidences of self-harm, it is also true that Lintern exaggerates the strength of the evidence that she has engaged in self-injurious behavior. There are records from June 2011 to April 2012 indicating that Lintern's attempt to use scissors on herself raised a concern, that she banged her head on her desk and that she made self-harming or suicidal statements. [R. 10-7, Tr. 336-37, 341, 485, 490; R. 10-8, Tr. 552]. Records from May to November 2012, in contrast, reveal no suicidal or homicidal thoughts during mental status examinations, no reports of self-harming behaviors in school, and findings that her "behavior is not indicative of self-harm." [R. 10-7, 491-92; R. 10-8, Tr. 541-43, 547-49].

The ALJ is required to make a reasoned decision based upon all the evidence, but does not need to discuss every detail in the record. *See Boseley v. Comm'r of Soc. Sec. Admin.,* 397 F. Appx 195, 199 (6th Cir.

13

2010). The Court finds the ALJ's conclusion that Lintern had a less than marked limitation in self-care was reasoned and is supported by substantial evidence.

### D. Health and Physical Well-Being

Lintern argues that the ALJ's finding of a less than marked limitation in this functional domain failed to properly account for symptoms associated with her arthritis and leg-length discrepancy. The Court disagrees. The ALJ found less than a marked limitation in this area, noting that Lintern's arthritis had not been limiting to the extent necessary to qualify for a marked limitation, despite the fact that she had not been fully compliant with prescribed treatment. [R. 10-2, Tr. 22-25, 33]. The ALJ further noted that the lack of compliance, while not Lintern's fault, suggests that her symptoms were not as severe or limiting as alleged. [*Id.*, Tr. 24-25]. These conclusions are supported by substantial evidence of record.

Lintern was first diagnosed with polyarticular juvenile idiopathic arthritis in 2007, where Dr. Hilary Haftel noted that she was still active despite having an abnormal gait, active synovitis in her right knee, and swelling and synovial thickening in her hands. [R. 10-7, Tr. 243-44]. In July 2010 Lintern was prescribed a shoe lift after she was assessed with a leg length discrepancy. [*Id.*, Tr. 313]. By November 2010, Dr. Haftel noted

no active synovitis and that Lintern's arthritis was under better control with the present therapy, despite some diminished range of motion in her right wrist. [*Id.*, Tr. 282-84].

In March 2011, Lintern's arthritis was described as non-limiting in terms of activity, despite claims of morning stiffness, limited right knee range of motion and missed doses of medication. [*Id.*, Tr. 279-81]. Throughout 2011 and 2012, Lintern's mother was documented as repeatedly forgetting to obtain and/or administer Lintern's medication, and periodically failing to obtain the lab work necessary to continue the prescription. [*Id.*, Tr. 280, 303, R. 10-8, Tr. 498, 502-03, 509-13, 523, 531-33].

Lintern also broke her femur in July 2011, after which her mother took her for emergency medical attention, and she underwent surgery and a course of physical therapy that resulted in improvement. [R. 10-7, Tr. 344-52, 358-68; R. 10-8, Tr. 521-22]. Around the same time as her femur break, her arthritis was re-diagnosed as psoriatic arthritis and Plaquanil was added to her regimen, but her mother stopped administering that medication by January 2012. [R. 10-8, Tr. 502-503, 523]. At that time, Dr. Haftel noted she planned to stop her current medication and start Enbrel (etanercept) in its place. [*Id.*, Tr. 503]. By April 2012, Lintern's mother

15

noted improved compliance, and the doctor noted improvement in Lintern's arthritis on new medication.  [*Id.*, Tr. 496].

Lintern's physical exams both before and after her switch to Enbrel revealed no active synovitis in any joint and her gross and fine motor skills were within normal limits.  [R. 10-7, Tr. 280; 301, 303, 306; R. 10-8, Tr. 496-97; 503; 524]Additionally, despite her shoe life and the fact that her right foot turned out when she ran, her gait was steady and non-lateralizing. [*Id.*]. .

Lintern places significance on school psychologist Dr. Worthing's notation in December 2012 that Kennedy had a noticeable limp (without pain) and used a palmar grip with her right hand when manipulating blocks, and suggested that "[p]erhaps her arthritis is affecting both her leg and her fine motor control in her right hand."  [R. 10-8, Tr. 582].  These opinions are both speculative and outside of Dr. Worthing's expertise.  *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (psychologist not qualified to render opinions regarding physical conditions).

For these reasons, the ALJ's finding of less than a marked limitation in this functional domain is supported by substantial evidence in the record.

### III.   CONCLUSION

Because the ALJ properly assessed less than marked limitations in

each of the six functional domains, her conclusion that Lintern is not disabled is supported by substantial evidence of record. Therefore, the Court **RECOMMENDS** that Lintern's Motion for Summary Judgment **[R. 14]** be **DENIED**, the Commissioner's Motion **[R. 16]** be **GRANTED** and this case be **AFFIRMED**.

s/Elizabeth A. Stafford<br>ELIZABETH A. STAFFORD<br>United States Magistrate Judge

Dated: June 29, 2015

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991);

*Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 29, 2015.

                                   s/Marlena Williams
                                   MARLENA WILLIAMS
                                   Case Manager